My next case for argument is Rasho v. Elyea, Mr. Jones. Thank you, Your Honor. May it please the Court, Dan Jones on behalf of Plaintiff Appellant Ashoor Rasho, with me at council table are Mark Kadish and Lee Abrams. Our position in this appeal is a straightforward one. It is for a jury to resolve the numerous factual disputes between the two sides. And I'd like to focus in particular on why Mr. Rasho is entitled to a trial against defendants Massa and Garlick. Subject to any questions from the Court, we would stand on our briefs as to the remaining defendants. To begin with, the District Court made two fundamental legal errors in granting summary judgment, neither of which the defendants make much effort to defend on appeal. First, the court below reasoned that the extraordinary efforts made by Dr. Jose Matthews beginning nearly two years after Mr. Rasho's transfer out of the specialized mental health unit and into the North segregation unit could somehow cure the constitutional violation in its entirety. And second, the court below thought that the physical injury provision of the Prison Litigation Reform Act could bar Mr. Rasho's claims altogether. Rather than defend the District Court's reasoning, defendants raise a host of factual disputes. As you can tell from the briefs, the two sides have very different versions of the nature and extent of Mr. Rasho's mental illness, why he was transferred to the North segregation unit, and the effect of that transfer on his mental health. Well, there was that one incident of self-mutilation seven months after his transfer in June of 07. What other evidence is there in the record that suggests that his condition deteriorated after he was transferred? Sure. So there's his own sworn testimony in terms of physical injury that his self-mutilation, in fact, escalated after he was transferred. But even more fundamentally, Your Honor, Dr. Silberberg, our expert, testified that after the transfer, he suffered a host of psychological harms which are independently actionable under the Eighth Amendment, even if they don't manifest in an acute physical form. And so really, the large dispute between the two sides over the severity of this physical injury goes at most to the quantum of damages. It wasn't a summary judgment issue. Wasn't the real thing that made a difference in terms of his condition the involvement of Dr. Matthews? That when Dr. Matthews comes on the scene, it seems like he does much better. When he's not there, Mr. Rascio does much worse. And if that's the case, how would Dr. Massa know that the care was going to be inadequate? In other words, there's this assumption that transferring Mr. Rascio is going to result in a lower level in care. But it seems like it's not the transfer. It's the specific person who's available. And if Dr. Matthews had been on the scene the whole time, perhaps there would be no change at all and he would have done well from the get-go. It's a combination of two things, Your Honor, because the physical conditions that he was placed into are indeed very important and did indeed infect his mental health. And so you have to look at both the combination of physical conditions and the access to care and quality of care. Both of those are relevant dimensions. And at the time of his transfer, there simply was nobody like Dr. Matthews available in North Segregation. And how did Dr. Massa know that? Because you have to – there's sort of this assumption that Dr. Massa – that he knows that Mr. Rascio is not going to receive appropriate and reasonable care once he's transferred. But even if Dr. Massa transferred him out of spite because he was filing too many grievances, et cetera, that doesn't necessarily lead to the conclusion that Dr. Massa realized that the care would be different. Certainly, Dr. Massa – a reasonable jury could conclude that Dr. Massa did indeed know that because of the horrendous conditions and the lack of access to care in North Segregation, as Dr. Silberberg testified, no competent mental health professional would have done what he did to Mr. Rascio. And so this is just yet another factual dispute. So you would prove that circumstantially because there was nothing that came out in the deposition testimony that he knew the quality of care would be? That's largely correct, Your Honor. And certainly, the subjective deliberate indifference standard can be proved by circumstantial evidence. Well, I thought your argument was that because he had said that he's suing us too much that he intended bad things to happen to Rascio. Oh, that's absolutely right. Punished him for his litigiousness. That's absolutely right, Your Honor. And as I was about to get to in response to Judge Williams' question, there's much more than our own experts' testimony. There's a number of things that a jury could look at in inferring culpable state of mind here. That's certainly one of them, Mr. Rascio's own sworn testimony that he was retaliated against in response to his resort to the inmate grievance process. But another thing the jury could look at is the mismatch between the proffered reasons for the transfer and their actual prescription history. As Dr. Silberberg testified, it would be astounding to prescribe somebody without a serious Axis I mental illness the kinds of drugs like Giodon that Dr. Massa, in fact, was prescribing. And so even defendants' own position isn't even internally coherent in the sense that they say, oh, well, he's just untreatable. He's a bad guy. He's not really sick. But yet, at the same time, they were prescribing him these medications that are only appropriate when somebody is indeed very sick and needs treatment. And the final point that I think is also relevant is that a jury could look at the post-transfer conduct of these two defendants as well. And in particular, the testimony is that after the transfer, Dr. Matthews explained that Dr. Massa came to me after this lawsuit was filed and said, well, can you change your diagnosis of bipolar because he's suing us? And at that point, Dr. Massa hadn't even been treating him for years. And so it seemed to be only because this lawsuit was filed that he went ahead and asked Dr. Matthews to revoke that diagnosis. And they point out that, well, Dr. Matthews did, in fact, revoke the diagnosis of bipolar. But what they neglect to mention is that he replaced it with a different Axis I diagnosis, which was schizoaffective disorder. So that doesn't really help them. Dr. Matthews certainly didn't conclude that Mr. Rochot was not sick. On the contrary, he concluded that he was, in fact, very sick. He just refined his Axis I diagnosis. And then with respect to Dr. Garlick, a jury can look at the fact that when Dr. Matthews, towards the end of his tenure at Pontiac in 2012, recommended that Mr. Rochot be transferred back to the mental health unit precisely because nobody else could provide the kind of extraordinary care he was providing. Was that – I'm sorry. Is that what Dr. Fletcher said? No, no. This is Dr. Matthews, who was the later treating psychiatrist in North Segregation. Towards the end of his tenure at Pontiac, he said, you know what, he needs to go back to the mental health unit. Nobody else is going to be able to provide this kind of care that I am providing him now. But that recommendation was blocked by Dr. Garlick. Well, did Dr. Fletcher recommend Rochot be transferred off MHU before MASA arrived? We think this is a disputed issue of material fact, Your Honor. There's certainly an annotation. This is described at some length in our reply brief. But there was a medical record that annotates – there seems to be a note that says, consider transfer from the mental health unit secondary to manipulation over treatment. But there are a couple of things about that. First of all, a placement review board decision from the following day said that a request for transfer came from Mr. Rochot himself and that it was made against the recommendations of your treating psychiatrist. So it's not at all clear whether she followed through with that annotation at all. And what's more, even in that medical evaluation, she too recommended the prescription of Giodon, which again would only be appropriate if our testimony is to be believed, as a jury certainly could, that it would only be appropriate for somebody with a serious Axis I mental illness. Just another couple of things about the physical injury requirement. We've heard a lot, certainly in the briefs from the other side, about, oh, well, he didn't really do so poorly in Norse segregation. Because, well, there's only this one instance of self-mutilation documented in the record. And as I mentioned, at most, this is a fight about the quantum of damages that isn't appropriate to bar the case altogether. But what's more, it's sort of remarkable. The state says, oh, well, he self-reported that mutilation. He wrote an affidavit that said, you know what? I cut myself today. I was feeling really depressed, and I wanted to go on crisis watch. But a jury could think about that and say, well, what if he had not reported it? And it just goes to show that sort of nobody was paying attention to people in these horrible conditions in Norse segregation. Had he not bothered to write that down and report it, it may well have gone unreported. And this is another reason why his own sworn testimony, that his self-mutilation, in fact, escalated after his transfer, may well be believed, even if there's not a ton of sort of extraneous medical records in the record to support that. How will the outcome of this case affect the pending class action? I'm just curious. Oh, no. Our intention is that it would not at all. And the reason for that is that the class action is purely prospective. Well, not merely, but it seeks only declaratory and injunctive relief, seeking to reform the practices of the Illinois Department of Corrections going forward. And this case, by contrast, seeks only individual redress for the past harms suffered by Mr. Rochot. And that's why, to be clear, Judge Mim had both of these cases before him. And he said, look, this is an individual damages action. I'm going to sever it off and break it off and treat it completely separately. And one other point about that, and that's that this court, at this time, wouldn't be making any findings or judging any of these claims on the merits, ultimately. And so, to the extent it goes back to Judge Mim for trial, to the extent there's concern about overlap, Judge Mim, having both cases in front of him, would be perfectly capable, in his discretion, of managing the cases to avoid any kind of conflict or concern that may arise. If there are no further questions. Okay. Thank you, Mr. Jones. So, Mr. Siegel? Mr. Odom, I have the honor. I'm sorry. You're not? I represent Dr. Massa. I'd like to talk about the first time that Dr. Massa saw Mr. Rochot. He saw him on May 25th, 2006, and based on that very first visit, he recommended that Mr. Rochot be transferred off the mental health unit. And the reason he gave for that, he said that based on his diagnosis, his symptoms, and his personal observation, he did not believe that Dr. Rochot would benefit from staying on the mental health unit. He still continued to prescribe medication, though, right? He did. He took him off of trazodone, which is a sleep medication, but left him with the, I believe it's the Geocon or something. But, yes, he was kept on medication, as are many other prisoners throughout this maximum security facility. And he gives this medication for antisocial personality disorder? I believe he did, yes, Your Honor. He believed it was appropriate. But it could be used for treatment of other mental health conditions, correct? Absolutely. That are more serious than this? It can be, yes. Yes, Your Honor, that's my understanding. Rochot contends that Dr. Massa's explanation was pure pretext. He says that, no, no, no, no. He wasn't recommending a transfer out of the mental health unit because of his diagnosis or his symptoms or his observations. No, he was doing it because he was sick and tired of all these grievances, lawsuits. He was fed up. He's going to retaliate. He's going to teach this guy a lesson. He's going to show him what happens when you file grievances like this. Well, keep in mind, this is the first time he'd ever seen the man. He'd only been working there for two months, less than two months. And somehow he is fed up with grievances. We don't even have anything in the record showing that a grievance was filed against Dr. Massa. So right off the bat, I have to question, this is a very unusual case. Now, the same day that Dr. Rochot saw him for the very first time, Mr. Rochot saw Dr. Smith, and he told Dr. Smith, I want off of the mental health unit, and if you don't give me what I want, I'm going to retaliate. He says, I'm going to start disrupting this unit. And then he gave him a deadline. He said, you'll have until June to get that done for me. Has Rochot, in fact, filed any grievances? There are some grievances in the record, but there are certainly none against Dr. Massa that I can see that I've found, and certainly not. So who are they against? I believe that they were against anybody and everybody. Which included people in the medical unit? Yes. So why does it matter that it's not against Dr. Massa? If the guy is suing all of his colleagues and the people that he works with every day, and as far as Dr. Massa knows, he's going to be the next person. This person is a troublemaker. If he has to keep seeing them on a regular basis, he's probably going to get grievances filed against him too. I don't see how the fact that Dr. Massa is not responded to or not called upon to respond to any grievances, that he's never been sued, he's only been there for less than two months, how is it that he built up this rage that he would want to retaliate against this individual? Now, the same day after he spoke with Dr. Smith, it became established that Mr. Rochot was using disruptive behavior to manipulate the staff. So we know that. Why isn't this a jury question?  The jury decides whether they believe Dr. Massa's reason for recommending a transfer. This is not a jury question because it shows that Dr. Massa's decision was a reasonable decision based on medical science, that it was not a matter of retaliation, that the retaliation claim itself is pretext, that he couldn't have generated the rage and the intent to retaliate after being less than two months with the Pontiac facility. So you're just saying, so he needed to be a pain to him for a longer period. Three months would have been enough, four months. I mean, I don't understand. Somebody can be a pain after two weeks if they're filing. But what if he hasn't caused any pain? What if he hasn't caused any annoyance? No, no, I'm just saying if he's filing those grievances, you're trying to make it time just because he was there two months. I'm just saying I don't think that cuts it alone if somebody is regularly filing complaints. Alone it does not. And if there are other people that are in within that two-month time frame where there are complaints that have been filed, why wouldn't that classify it? Dr. Massa's decision cannot be viewed, or his recommendation cannot be viewed in a vacuum. This was a committee decision to transfer him off the unit. I think it's important to know, though, that he made his recommendation on the very first visit, and he wasn't transferred immediately. He was transferred over a year later. Now, the ratio must come forward with some evidence that Dr. Massa knew that his recommendation would result in Mr. And there's no evidence of that. To the contrary, Mr. Rochot relies heavily on the testimony of Dr. Matthews. Dr. Matthews first saw Dr. Rochot after he had been transferred out of the unit 21 months after he had left the mental health unit is when Dr. Matthews first saw him. Let me describe to you what he saw. After 21 months in the North Segregation Unit, Dr. Matthews reported that Rochot appeared to be doing well. He had no hallucinations. His thoughts were organized. His insight and judgment were fair. He had not had any self-mutilation incidents in over a year. In contrast to his time in the mental health unit, he never once attempted self-mutilation during the two-and-a-half-year period that Dr. Matthews treated him. Now, the only person who ever recommended that Mr. Rochot be transferred back to the mental health unit was Dr. Matthews, and he made that recommendation after Mr. Matthews had been returned from Stateville. In other words, he treated him for all those years and never once said, this guy's got to go back to the mental health unit. It was only in 2012, after the return from Stateville, that we finally have one professional medical treater stating that this guy should go back to the mental health unit. Dr. Massa was already gone. Now, a plaintiff's expert stated that he had absolutely no complaint with Dr. Matthews' treatment. Then why is it that after two-and-a-half years of treatment, Dr. Matthews never recommended that he be transferred back? They have no complaint about that. They only complain about Dr. Massa's initial decision, which was made on the very first time he saw him. If there are no further questions, we urge the court to affirm. Thank you. Okay. Thank you, Mr. Unrath. Mr. Siegel? Good morning, and may it please the court, counsel. I'm Assistant Attorney General Evan Siegel on behalf of the State Defendants. And there's an overarching point that I want to make to the court this morning, and that is this. The Department of Corrections provides constitutionally adequate treatment wherever inmates are housed in Pontiac. The particular labels for whether we're talking about the mental health unit or the North Segregation Unit, they don't matter. But that's essentially Mr. Rushue's claim. It's labels over substance. He received, however, sufficient mental health care when he was assigned to the mental health unit and when he was in the North Segregation Unit. In both places, the department provided three critical treatment services. First, psychotropic pain medication wherever he was. And, yes, he was medicated in both places for his variety of conditions. Secondly, crisis intervention. And third, psychological counseling via individual therapy. And the record shows that Mr. Rushue received those treatments in the North Segregation Unit where Dr. Garlick transferred him, just as he did in the mental health unit. That means that the department's- What was the reason for transferring him? There were three reasons, Your Honor, for the transfer, and they were all based on medical judgment, not administrative convenience. First, after two and a half years in the mental health unit, Mr. Rushue showed no signs of improvement. He was hostile. He did not take into account other people's feelings. He was not considerate. He did not participate in group therapy, leading to the two other reasons, which were he was a danger to other inmates who had serious mental health issues in that treatment facility. He testified, or there's evidence in the record, that he enjoyed being difficult, being a thorn in the side. I imagine that's extremely common in the mental health unit. It may be extremely common, or it may be acute and limited to a number of different- But being uncooperative and manipulative can be a symptom of mental illness. It can be, and there is no disputed issue of material fact here that Rushue suffers from serious psychological conditions. The distinction, objectively, that's true. He suffers from borderline personality disorder, antisocial personality disorder. I think that counsel has tried in his reply brief in an argument this morning to suggest that there's some kind of material distinction between an Access I illness under the DSM and Access II, but I'm not aware that there's a hierarchy, that one is more serious than the other. He had serious mental conditions, and he was not benefiting from his placement there. He was intruding with the treatment of other inmates, and he was a threat and harm to the other staff there. He assaulted a nurse on more than one occasion. He got into disputes with the treating staff there. The only significant differences between the mental health unit and the North segregation are three. Group therapy was offered in the mental health unit. Continuity of care with the same therapist, and the noise level was higher in North segregation. But two of these really drop out. Rushue never really participated in group therapy, and importantly, the noise that we hear about the toxic conditions, there's no evidence in the record that there's any causation or any relation to a spike in the symptoms that Rushue demonstrated. So what this case really boils- So the continuum of care, he wasn't getting the consistent care level. That is what this case boils down to, continuity of care. In fact, the record shows that in the mental health unit, he elected to or participated in therapy with an individual therapist about once every month. In the North segregation unit, once- Well, we know from his treatment with Dr. Matthews that it was infrequent at the beginning, but then it was twice a month. So there was care in both places. It was available to him. But yes, in answer to your question, Judge Williams, this is what this case boils down to, whether he's being guaranteed psychological counseling with his preferred counselor on his desired schedule. And this relates to the question that you asked earlier, Judge Wood. What he essentially wants is a return to the state of our counseling that he experienced for several years with Dr. Matthews. Wasn't there some evidence in the record, and perhaps it was from Mr. Rushue's expert, that some of the problems with caring for him in segregation was that it was difficult for him to meet one-on-one with Dr. Matthews, that there wasn't private space, they had to do it in the cell, that the conditions were not just noisy at this location, but that prisoners were kept, in some cases, naked and just in a blanket, and that it was really a much more severe change in environment from just being a little bit noisy. And how is it that all of those other factors would not make it much more difficult to continue with treatment of somebody who has a serious mental illness? Well, the treatment with Dr. Matthews did continue successfully. It was excellent treatment, and Rushue wants a return to that. So they overcame some of those impediments. There were meetings, I think, in a conference room or in a private space, when available. But there's no Eighth Amendment violation as a result of these difficulties or less-than-ideal conditions. The Eighth Amendment doesn't guarantee state-of-the-art treatment. That's just touchstone law in the Eighth Amendment. Only what's adequate, treatment and psychological care itself, not placement in a particular place or meeting in a particular place, and certainly not assignment to the mental health unit. This is the constitutional requirement. And that's true for even somebody with a serious chronic condition like Rushue. Maintenance is the duty, the constitutional duty, and that's the care that he received wherever he was. And that's key, because Dr. Garlick's role in the decision to make the transfer did not trigger any sort of deterioration during the critical period of about 20 months, as my colleague referred to, when he was in the North Segregation Unit. Judge Williams, you asked, I think, about the one cutting incident. That's all the medical evidence there is. Rushue does say that his condition deteriorated. But what Dr. Silverberg says is the result of this transfer to the North Segregation Unit is that he suffered humiliation or hallucinations. But again, there's no causal evidence that this transfer caused those symptoms, let alone that they caused the cutting incidents. Dr. Silverberg could not say with any certainty when Rushue would cut again. And this case, this court has held in numerous cases involving mentally ill prisoners or inmates that there's no duty to act, and therefore no deliberate indifference unless the self-harm is imminent, unless we're on the verge of that. We're not on the verge of anything imminent here, let alone cutting. So we would ask the court to affirm the district court's grant of summary judgment to all of the state defendants. Okay, thank you, Mr. Siegel. Thank you. So Mr. Jones, do you have anything brief? Thank you, Your Honor. There are a number of things I want to correct, starting with the state. First of all, our claim has never been that Mr. Rushue is entitled to state-of-the-art treatment. It's only that he's entitled to the minimum treatment, minimally adequate treatment required by the Eighth Amendment. And so he relies heavily, for instance, on saying that Dr. Silverberg couldn't say with 100 percent certainty when Mr. Rushue would cut himself. But what he did say is that putting him in these toxic, horrendous environment, like the North segregation, as Judge Wood pointed out, is going to impact his mental health. It's going to increase the risk of him harming himself, and that risk is actionable under the Eighth Amendment and under the long line of cases explaining that a substantial risk of harm is the key, not that it, in fact, manifests in necessarily an objectively severe way, although we think it did here. But the other thing that I want to mention about that, too, is that they failed, basically, to address the fact that psychological torture is itself actionable harm under the Eighth Amendment. And so, again, what they're doing is largely disputing the amount of damages, not disputing whether he has a valid claim. One other thing I want to mention about the AXIS-1 versus AXIS-2. AXIS-1 definition—excuse me, AXIS-1 condition, by definition, is one that responds to clinical treatment. It's one that's treatable, in other words. And AXIS-2, by contrast, are these things like personality disorders, which basically are this person has ingrained character flaws and those aren't sort of treated acutely by medication in the way that an AXIS-1 illness is. So it's not a hierarchy exactly, but they're very different in terms of the kinds of treatment. Well, what about Mr. Unrath's point? He said that there were no complaints against MASA and he couldn't have been retaliating because he'd only been there a short period of time and— I think a number of those things, in fact, cut against him. To begin with, just as a legal proposition, I've never—I don't think there's any indication in this court's retaliation law that you can only retaliate if the grievance are directed at you personally. No, the question is the plausibility of his having retaliated. If there were no complaints against him, he would be less wroth at Rasho's behavior, right? That's certainly their theory. We would say that's disputed. But the reason I want to say that it in fact cuts against him is this is a man with a long, long documented history of serious mental illness, even before he got to Pontiac in 2003. So the idea that he took one look at him the first time he saw him and said, this guy can't be on the mental health unit, a jury says, well, how do you know that? You know, he's been treated for years. He's been in the mental health unit. Immediately he made a snap decision that this man needed to go. And then he followed up on the decision every time he saw him. Again, he said, no, he has to leave the mental health unit. No, he has to leave the mental health unit. I think a jury looking at that would say, well, how did he know with such certainty immediately? But that sounds more like negligence than like retaliation. Well, I— What's the evidence of retaliation? Again, I think there's Mr. Rochot's own sworn testimony. But there's also—a jury can look at the mismatch again between what he was actually prescribing for Mr. Rochot and his proffered reasons for the transfer. But I think he did in fact know that Mr. Rochot had a serious mental illness, or at least a reasonable jury can conclude that. And that was from not only his substantial medical records, but also from his own conduct in how he prescribed medication to Mr. Rochot. But is there any evidence about—is it entirely Rochot's evidence that Garlick and Masso were retaliating against him? It is Mr. Rochot's own sworn testimony, yes. Although I want to mention one quick thing about that. The district court looked at that and said, well, that evidence isn't good enough because he happened to use the word basically when he prefaced an answer. And I just want to give a little bit of context about that. He was asked point blank at his deposition by opposing counsel below, do you know why you were transferred out of the mental health unit in the first place? He said, because I filed too many grievances against Pontiac's dad. And then he was asked, who told you that? He said, Dr. Massa and Dr. Garlick. And so then his answer was basically recast as a question. So Dr. Massa and Dr. Garlick told you that they were kicking you out of the mental health unit because you filed too many grievances. He says, basically, yes, that's what it came down to. And then the colloquy goes on, and he says, basically, it elucidates that he, in fact, heard this in two separate occasions from both of them. Dr. Massa, at the time he was being kicked out in November 2006, told that to him, and Dr. Garlick told it to him when he was blocking Dr. Matthews' recommendation in 2012 that he be returned to the mental health unit. And so there is sworn testimony to that effect, and that on its own is enough to defeat summary judgment. So how many grievances did your client file? There are certainly a number, Your Honor. One I can point to that's in the record and that predates this decision by Dr. Massa is attached to the deposition of Dr. Smith. I believe it's 62-31, and it was a complaint filed in late 2004, 2005 about a noise ordinance in the mental health unit. Are there any other ones? He certainly, in his deposition, talks repeatedly about the various lawsuits and grievances that he has, and also I believe there's more in the administrative record. I'm sorry, I just don't have the exact sites for you. But there's more than that one case. Yes, yes. There were lawsuits filed. Yes. How many? Do you have an idea? I don't, Your Honor. I'm sorry. Okay. Well, thank you. Thank you. And were you appointed? No, we represented him below as well. Pro se? Pro bono. Pro bono. Yes. Okay. Thank you. Sorry. One second. Unintentional slip.